Jonathan O. Hafen
PARR BROWN GEE & LOVELESS, P.C.
185 South State Street, Suite 800
Salt Lake City, UT 84111
Telephone:   (801) 532-7840
Facsimile:   (801) 532-7750
jhafen@parrbrown.com

*Attorneys for Plaintiff Legacy Health Care, Inc.*

FILED
U.S. DISTRICT COURT

2009 NOV 12  P 4: 11

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| LEGACY HEALTH CARE, INC., a Utah corporation,<br><br>            Plaintiff,<br><br>vs.<br><br>KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services,<br><br>            Defendant. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND FOR SUMS DUE UNDER THE MEDICARE ACT**<br><br>Case: 1:09cv00149<br>Assigned To : Stewart, Ted<br>Assign. Date : 11/12/2009<br>Description: Legacy Health Care v. Kathleen Sebelius et al.<br>1 |

Plaintiff, Legacy Health Care, Inc. ("Legacy"), through its attorneys, for its Complaint against defendant, Kathleen Sebelius, Secretary of the United States Department of Health and Human Services, alleges and states as follows:

### I. INTRODUCTION

1.   Plaintiff Legacy is a Medicare certified hospice provider with its principal place of business in Layton, Utah. As a hospice provider, Legacy provides hospice care to eligible terminally-ill Medicare patients and services to their families.

2.   The Federal government pays hospice providers like Legacy pursuant to a Medicare program established under Title XVIII of the Social Security Act (the "Medicare

Act"). The Department of Health and Human Services ("Medicare") administers the hospice benefit and reimburses hospice providers on a per diem basis for services to its beneficiaries. However, aggregate annual Medicare payments to hospices are subject to an aggregate annual provider cap (the "cap"). Any provider whose revenues from Medicare exceed its aggregate cap allowances for any given year is subject to demands for repayment of the difference from Medicare.

3. On April 3, 2009, Medicare made a demand for repayment to Legacy in the amount of $506,014 based upon its calculations of Legacy's cap obligation for the Medicare fiscal year ended October 31, 2008 ("FY 2008").

4. Legacy has become aware that several other hospices have challenged the validity of the Medicare regulation used to calculate the cap. Multiple federal district courts have already determined that the regulation pursuant to which Medicare performs the cap calculation is invalid. (*See Sojourn Care, Inc. dba Sojourn Care of Tulsa v. Michael O. Leavitt*, Case No. 07-CV-375-GKF-PJC (N.D.Ok. filed 2007), order granting summary judgment and reporter's transcript re summary judgment hearing attached hereto as Exhibit A); *and also Los Angeles Haven Hospice, Inc. v. Sebelius*, Case No. 08 CV 4469 GW (RZx) (C.D.Cal. order filed 7/13/09 granting summary judgment of invalidity attached hereto as Exhibit B; final judgment attached hereto as Exhibit C)).

5. On September 9, 2009, Legacy filed an appeal of the FY 2008 cap determination with the Provider Reimbursement Review Board ("PRRB"), challenging the validity of the Federal regulation pursuant to which the cap was calculated.

6. Contemporaneously with the submission of the FY 2008 appeal, on September 9, 2009, and because it appears under law that the PRRB lacked jurisdiction to assess the validity of a regulation, Legacy sought expedited judicial review of its appeal for FY 2008.

7. On September 23, 2009, the PRRB granted Legacy's expedited judicial review request as to the FY 2008 cap demand, finding, with no objection from Medicare, that there are no material facts in dispute, that the amount in controversy exceeds $10,000, and that Legacy's appeal involves principally a legal challenge to the validity of the regulation. When the PRRB makes such a ruling, a Medicare provider has 60 days to file a civil action in Federal District Court. 42 U.S.C. §1395oo(f)(1). Legacy is timely filing this complaint pursuant to its rights under 42 U.S.C. §1395oo(f)(1).

8. Legacy asserts that Medicare regulation governing calculation of the cap, 42 C.F.R. § 418.309(b), is contrary to the plain language of section 1814(i)(2)(C) of the Medicare Act (codified at 42 U.S.C. § 1395f(i)(2)(C)), is arbitrary and capricious, and is in excess of statutory authority. *See* 5 U.S.C. § 706(2). Legacy alleges that it has been materially prejudiced by Medicare's refusal to abide the Congressional mandate regarding the methodology for calculation of the cap.

9. Accordingly, by this action, Legacy seeks a declaration and order that: (a) Medicare regulation 42 C.F.R. § 418.309(b) is invalid; (b) vacates the regulation and enjoins Medicare from prospective use of the regulation in calculating the hospice cap liability of Legacy or any other hospice provider under 42 U.S.C. § 1395(f)(i)(2); (c) Medicare's prior calculation of Legacy cap amounts pursuant to 42 C.F.R. § 418.309(b) for fiscal year 2008 is invalid and unlawful and therefore set aside; (d) Medicare restore to Legacy (or credit against a new demand) all sums paid by Legacy pursuant to demands based upon the invalid regulation (with

311705         -3-

interest) and other further relief as appropriate; and (e) the matter then be remanded to Medicare for proceedings not inconsistent with such a judgment.

## II. JURISDICTION AND VENUE

10. This action arises under the Medicare Act, 42 U.S.C. § 1395 *et seq*.

11. This Court has jurisdiction under 42 U.S.C. § 1395oo(f) and 28 U.S.C. § 1331.

12. Venue lies in this judicial district pursuant to 42 U.S.C. § 1395oo(f)(1).

## III. PARTIES

13. Legacy provides hospice services to eligible Medicare patients in and around Layton, Utah, specifically patients who are terminally ill and who have been certified by physicians to have less than a six month life expectancy if the illness runs its normal course. Legacy has its principal place of business at 3135 North Fairfield Rd., #A, Layton, Utah, 84041.

14. Defendant Kathleen Sebelius is the Secretary of the Department of Health and Human Services, the federal agency responsible for administration of the Medicare program. Pursuant to FED. R. CIV. P. 4(i), service upon the Secretary of the Department of Health and Human Services is completed by delivering the summons and complaint via the following three procedures: (a) personal delivery to the U.S. Attorney for the district where the action is brought; (b) registered or certified mail to the Attorney General of the United States in Washington, D.C.; and (c) registered or certified mail to the Secretary of the Department of Health and Human Services.

## IV. STATUTORY AND REGULATORY BACKGROUND

### A. Hospice Benefit Background

15. The hospice benefit started as an experiment in humane end-of-life care. In 1982, when Congress created the hospice benefit, two caps -- or limits -- were imposed. A lifetime cap

limited each beneficiary to a maximum of 210 days of hospice care and a cap on providers limited the amount Medicare would pay any specific provider in a single year.

16.  Initially, 95 percent of patients choosing hospice care were beneficiaries diagnosed with cancer who had exhausted or grown weary of other treatment options. They stayed in hospice care for only days or weeks and few patients or providers ever exceeded either respective limit. As a result, few, if any, hospices ever encountered any cap issue.

17.  By the early 1990s, hospice was broadly recognized as superior end of life care, and proved highly effective at reducing expensive and often unwanted hospitalizations. At that time, however, 75 percent of Medicare beneficiaries with terminal illnesses -- those not suffering from cancer -- still did not have access to hospice services. Medicare required a physician to certify that a beneficiary had six months or less to live before referring them to hospice care. Many physicians chose not to refer non-cancer patients to hospice because of the uncertainties inherent in life expectancy calculations.

18.  Congress took steps to remove this barrier in 1998 with legislation that eliminated the cap on an individual beneficiary's right to receive hospice care, provided that a physician continued to certify that the patient had a life expectancy of six months or less if the disease runs a normal course. Pursuant to these changes, the Medicare Act now provides unlimited hospice coverage for individual Medicare beneficiaries who are certified as terminally ill with a life expectancy of six months or less. Specifically, the Medicare Act now allows hospice care for "two periods of 90 days each and an <u>unlimited</u> number of subsequent periods of 60 days." Section 1812(a)(4) and (d) of the Medicare Act (codified at 42 U.S.C. § 1395d(d)(1)) (emphasis added). The statutory provisions setting the aggregate hospice provider cap were not amended to make them consistent with the statutory expansions in hospice coverage.

19.     Critically, at the same time, Medicare began developing objective standards to define non-cancer patient hospice eligibility so that physicians would have confidence in making terminal diagnoses. These standards seek to identify objective characteristics in approximately ten distinct terminal illnesses that suggest an average six month life expectancy.

20.     Today, more of America's terminally ill seniors are being given a hospice choice, and eligible beneficiaries are able to remain enrolled in hospice services until they pass away. Non-cancer patients now have better access to hospice care, and make up more than 50 percent of hospice patients.

21.     With these statutory changes and objective eligibility standards, medically eligible beneficiaries are able to stay longer in hospice care. As a consequence, average length of stay is rising.

22.     But, hospice providers who are providing covered services to eligible Medicare beneficiaries have begun exceeding the cap at an alarming rate. In 1997, virtually no hospice providers exceeded the cap. In 2004, hospices in 15 states (including Utah) exceeded the cap. These providers were asked to repay Medicare an estimated $100 million. For fiscal year 2006, it is estimated that hospices in at least 25 states have exceeded the cap and that those providers have been or will be asked to repay approximately $200 million to Medicare. In Utah and throughout the country, a significant number of hospices have been subject to substantial cap repayment demands for fiscal years 2007 and 2008 as well.

### B. The Calculation of the Aggregate Provider Cap

23.     Since inception, the Medicare Act has provided that total payments to a hospice provider in any fiscal year may not exceed an <u>aggregate</u> cap, calculated as the product of the individual cap amount (adjusted annually for inflation) and the "number of Medicare

311705                                      -6-

beneficiaries" in a hospice program in any given accounting year. Section § 1814(i)(2)(A) of the Medicare Act (codified at 42 U.S.C. § 1395f(i)(2)(A)). In 2006, the cap amount per beneficiary was $20,585.39. In 2007, the cap amount per beneficiary was $21,410.04. In 2008, the cap amount per beneficiary was $22,386.15.

24. The Medicare Act specifically provides that the number of beneficiaries in an accounting year <u>must</u> be adjusted to reflect the time each such individual was provided hospice care in a previous or subsequent accounting year (42 U.S.C. § 1395f(i)(2)(C)):

> "For the purposes of subparagraph (A), the 'number of Medicare beneficiaries' in a hospice program in an accounting year is equal to the number of individuals who have made an election under subsection (d) of this section with respect to the hospice program and have been provided hospice care by (or under arrangements made by) the hospice program under this part in the accounting year, <u>such number reduced to reflect the proportion of hospice care that each such individual was provided in a previous or subsequent accounting year</u> or under a plan of care established by another hospice program." (Emphasis added.)

25. In 1983, when Medicare issued its proposed regulation to implement the hospice cap, it acknowledged:

> "The statute specifies that the number of Medicare patients used in the calculation is to be adjusted to reflect the portion of care provided in a previous or subsequent reporting year or in another hospice."

48 Fed. Reg. 38,146, 38,158 (Aug. 22, 1983). Medicare also acknowledged that "The requirements [of the statute] do not allow discretion in the computation method." *Id.*

26. However, Medicare nonetheless declined to adopt the specific computation methodology mandated by Congress and instead chose to give providers credit for the cap allowance of each patient only in the <u>initial</u> year of service, regardless whether the patient lived into another accounting year:

311705                                           -7-

> "With respect to the adjustment necessary to account for situations in which a beneficiary's election overlaps two accounting periods, we are proposing to count each beneficiary <u>only in the reporting year in which the preponderance of the hospice care would be expected to be furnished rather than attempt to perform a proportional adjustment</u>."

(Emphasis added.) 48 Fed. Reg., *supra*, at 38,158 (Aug. 22, 1983).

27. In so doing, Medicare conceded that it was planning <u>not</u> to implement the plain language of the statute because it would be "difficult":

> "Although section 1814(i)(2)(C) of the Act specifies that the cap amount is to be adjusted 'to reflect the proportion of the hospice care that each such individual was provided in a previous or subsequent accounting year . . .' such an adjustment would be <u>difficult</u> in that the proportion of the hospice stay occurring in any given year would not be known until the patient dies or exhausted his or her hospice benefits. We believe the <u>proposed alternative</u> of counting the beneficiary in the reporting period where the beneficiary used most of the days of covered hospice care will achieve the intent of the statute without being <u>burdensome</u>."

(Emphasis added.) 48 Fed. Reg., *supra*, at 38,158 (Aug. 22, 1983).

28. Notably, however, when it came to implementing the companion statutory requirement that the individual cap allowance be apportioned among different hospices if two or more provided services to a specific patient, Medicare expressly required a proportional allocation:

> "When a beneficiary elects to receive hospice benefits from two different hospices, we are proposing a proportional application of the cap amount."

*******************

> "We are aware that this type of apportioning of the beneficiary's stay may result in the inclusion of a beneficiary in the calculation of the cap for a reporting period other than the period for which the services were furnished, since it is necessary that the beneficiary die or exhaust his or her benefits before the percentage can be

> determined. However, we believe that this proposal is the most equitable means of implementing the <u>statutory directive to adjust the cap amount to reflect the proportion of care</u> furnished under a plan of care established by another hospice program."

(Emphasis added.) 48 Fed. Reg., *supra*, at 38,158 (Aug. 22, 1983). In short, Medicare demonstrated through its own conduct that apportionment of the cap across years was indeed possible.

29. In December 1983, Medicare issued its final hospice reimbursement regulation, including the provision allocating the hospice cap amount for a beneficiary receiving care from a single hospice only in the initial year in which the patient elected such hospice care. The regulation provides:

> "Each hospice's cap amount is calculated by the intermediary by multiplying the adjusted cap amount determined in paragraph (a) of this section by the number of Medicare beneficiaries who elected to receive hospice care from that hospice during the cap period. For purposes of this calculation, the number of Medicare beneficiaries includes –
> (1) Those Medicare <u>beneficiaries who have not previously been included in the calculation of any hospice cap and who have filed an election to receive hospice care, in accordance with § 418.24 from the hospice during the period beginning on September 28 (35 days before the beginning of the cap period) and ending on September 27 (35 days before the end of the cap period)</u>.
> (2) In the case in which a beneficiary has elected to receive care from more than one hospice, each hospice includes in its number of Medicare beneficiaries only that fraction which represent the portion of a patient's total stay in all hospices that was spent in that hospice..."

42 C.F.R. § 418.309(b)(1) and (2) (emphasis added).

30. In short, to attempt to ameliorate the negative effects of the departure from the Congressional mandate to allocate the cap across years of care, Medicare shifted the initial reporting year for "first election" of care from the standard Medicare fiscal year (November 1

through October 31) to an earlier time frame (September 28 to following September 27). For example, if a patient was admitted September 27, 2007, such patient's <u>entire</u> cap allocation would be entirely to fiscal year 2007; however, if the same patient was admitted September 28, 2007, such patient's <u>entire</u> cap allowance would be allocated to fiscal year 2008. Legacy alleges that this shift is insufficient to ameliorate the prejudice to hospice providers that have an average length of stay in excess of 70 days (as does Legacy and many others).

31. Medicare's allocation of the cap amount only to the first reporting period in which the beneficiary elects the hospice benefit results in the assignment of the entire cap amount to the first reporting period even if most of the hospice care for that patient is rendered in a subsequent period. Thus, unused cap amounts in one fiscal year are "trapped" in the prior year, regardless whether the beneficiary continues to receive care in subsequent years. The failure to allocate the cap across years of care results in an understated aggregate hospice cap allowances and, in turn, overstated repayment demands.

32. Medicare's failure to follow the Congressional mandate to allocate the cap proportionately across years of care is unlawful and subjects hospice providers to improper repayment demands for services properly rendered.

V. FACTS SPECIFIC TO THIS CASE

33. Legacy received its license as a hospice provider in Layton, Utah in 2004. Since that time, Legacy has served approximately 1,100 patients in Utah, the vast majority of which have passed away.

34. In fiscal years 2005-2007, Legacy had substantial cap surpluses, meaning that Legacy cap allowances exceeded Medicare revenue for those fiscal years. As a result, Medicare did not make any demand for repayment from Legacy for those fiscal years. Notably, such

surplus allowances are not carried forward to subsequent years, but are instead trapped in such prior year and unavailable to offset revenue in subsequent years.

35. But, in fiscal year 2008 (November 1, 2005 - October 31, 2008), Legacy continued to serve many patients first admitted in fiscal year 2007 and earlier. Medicare continued to pay Legacy for these services as rendered; however, because of the cap regulation which allocates the entire allowance to the first year (except for the insufficient shift) Legacy received no cap allowances for many of these FY 2005-FY 2007 patients in later fiscal years, including FY 2008.

36. As a result, on April 3, 2009, Medicare made a demand for repayment to Legacy in the amount of $506,014 for exceeding its cap allowances for fiscal year 2008. Legacy is injured by the fact of use of the invalid regulation to calculate its repayment demand.

37. Legacy alleges on information and belief that, if Medicare had followed the Congressional mandate to allocate cap room across years of service, its cap liability for FY 2008 would have been materially reduced. As a result, Legacy has suffered material prejudice from Medicare's failure to follow the Congressional mandated allocation of cap allowances across years of service.

## VI. ASSIGNMENT OF ERRORS

38. Medicare's regulation specifying the calculation of the hospice cap, specifically 42 C.F.R. § 418.309(b)(1), is contrary to the Medicare act (specifically 42 U.S.C. § 1395f(i)(2)(C)), is arbitrary and capricious, and is in excess of statutory authority. *See* 5 U.S.C. § 706(2)(A) and (C).

## VII. RELIEF REQUESTED

Legacy respectfully requests the following relief:

1. A declaration that Medicare's regulation regarding the calculation of hospice cap, specifically 42 C.F.R. § 418.309(b)(1), is unlawful and set aside.

2. A declaration that Medicare's prior calculation of Legacy's cap liability for fiscal year 2008, made under the invalid regulation, is set aside.

3. An order requiring Medicare to return to Legacy, with interest, or credit to a new demand, all monies Legacy has paid towards repayment of the alleged FY 2008 overpayment.

4. Pending final resolution of this matter, a preliminary injunction enjoining Medicare from: (a) enforcing the FY 2008 repayment demand; and/or (b) calculating subsequent fiscal year alleged overpayments relating to Legacy pursuant to the current version of 42 C.F.R. § 418.309(b)(1).

5. An order enjoining Medicare from prospective use of 42 C.F.R. § 418.309(b)(1) in calculating the hospice cap liability of Legacy or any other hospice provider.

6. An order requiring defendant to pay legal fees and costs of suit incurred by Legacy.

7. Such other and further relief as the Court may consider appropriate.

Respectfully submitted,

Dated this 12th day of November, 2009.

                        PARR BROWN GEE & LOVELESS

                        By: _____
                            Jonathan O. Hafen
                            Attorneys for Plaintiff Legacy Health Care, Inc.

Plaintiff's Address:
3135 North Fairfield Road, Suite A
Layton, UT 84041

311705